And the final case on the argument calendar today is the United States v. Jason Campbell, Sean Peter, and Stephen Sider. We have Mr. Dreitel for Mr. Campbell. Good morning. Good morning, Your Honor. Ms. Sternheim for Mr. Peter. Good morning. Good morning. And Mr. Ionella for Mr. Sider. Good morning, Your Honor. Good morning. And Ms. Robby for the government. Good morning, Your Honor. Mr. Robby, sorry. All right. Good morning, everybody. So we'll begin. I see that Mr. Dreitel is going first with five minutes and no rebuttal. Go ahead, Mr. Dreitel. Good morning, Your Honors. This is a case, it's really about the Rule 29 motion in which the district court, with respect to Mr. Campbell, right after a very short trial, said it's a close. There are two problems for the government with respect to sufficiency. They're somewhat related. They're factual and jurisdictional. One is that there is not sufficient evidence of the marijuana conspiracy charged in the indictment, and there is not sufficient evidence for saying that the homicide that occurred was in furtherance or during or in relation to that marijuana conspiracy. So both the marijuana conspiracy and the connection are lacking. None of the indicia of conspiracy that this court has relied upon in prior cases like Brock, which Judge Parker wrote the opinion in that case, and Gibbs and Hawkins cases cited in our briefs, none of those indicia are present here with respect to Mr. Campbell or really any, with respect to the marijuana conspiracy charged in the indictment with respect to streets. Whether there was prolonged cooperation between the parties, a level of mutual trust, standardized dealing, sales on credit, quantity of drugs involved, affiliation with the conspiracy, whether there's an established method of payment, all of that, there's nothing in the record with respect to that. Let me just ask you, why can't the government utilize the circumstances surrounding the murder and what led up to the murder to establish the motive behind it in terms of to protect the narcotics conspiracy and their participation in that? And I know this wasn't your client, but there was evidence that Mr. Peter yelled at Gray, if you think you're going to rob my brother, you got another thing coming. The government points to the so-called getaway bag. So there were circumstances surrounding the murder that had some link to drugs, right? He didn't yell at Mr. Gray. He yelled at, I think, Mr. Martinez as well. But the point is, Mr. Campbell's not involved in that at all. And I don't think, what I think the government does, and I think what the district court did in its opinion, is to bootstrap the murder to prove the narcotics conspiracy without the predicate of an actual narcotics conspiracy. Mr. Campbell, there's no evidence. But excuse me, before we get to Mr. Campbell, there's two issues. One is, is there a conspiracy? And the second is whether there is a link of any given defendant to the conspiracy, right? Correct. So on the first question, isn't there considerable evidence that the brothers had a marijuana conspiracy? Well, I don't want to speak for Mr. Peters, but for certain streets, yes, he was a marijuana dealer. The evidence was that he worked alone. So he was a marijuana, well, let me put it this way. And I'm sure we're going to hear from Sean Peters' lawyer to the contrary. And I don't want you to be prejudiced against another defendant. But let's just put it then hypothetically, if there were evidence sufficient to demonstrate a conspiracy between the brothers, that would get us past the first problem, right? And then the only question is whether your client is implicated in that conspiracy. Correct, Your Honor. And with respect to Mr. Campbell. As to that, is there not at least some evidence that on one occasion, he and Streets, who is, I guess, Shane Peters, may use it as a strong street to avoid confusion, that they were arrested at the same time on the same undercover sale? No. Mr. Campbell made the sale on the corner of the next block, the far corner. An hour later, he's arrested with Streets in front of the building where Streets did his dealing. Mr. Campbell doesn't have marijuana. That's a jury argument as to whether that is sufficient to show some connection between the two. That after his undercover sale, he goes back to Mr. Peter, and they're together at the place where Peter does his selling. And Peter has marijuana on him at that time. But Mr. Campbell doesn't. Mr. Campbell doesn't have cash. I would think there is not a case in this court that has found that to be sufficient to link the conspirator, the mere presence, even knowledge that Mr. Peter is a marijuana dealer. Then let's get to the, excuse me, let's get to the bootstrapping point, as you called it. Clearly, if someone never sold marijuana in his life, and had no prior connection to the asks him, I have a guy that needs killing because he tried to rob my drug spot. You interested? And the hitman punitively says, Sure, fine, and goes and does it. Has he not then joined the narcotics conspiracy? I'm not sure he joined the narcotics conspiracy, if it's merely a murder for hire. But in this case, doing the bidding, but that's completely hypothetical in this case, because because the conversation, there's no evidence of any such conversation. There's no evidence of any of that. Right? There's no direct evidence that anyone other than perhaps Sean Peter was aware of the reasons why this is taking place. Except for the fact that after the killing, all three go back to Streets's apartment, and then pick up the conspiracy bag, which has all of the stuff of the marijuana conspiracy and cleans it out of Streets's apartment. But Mr. Campbell didn't load that bag. He's not in possession of the bag. Again, it's just a mere presence argument. There's nothing in the bag related to Mr. Campbell. There's nothing forensic. There's nothing that connects it to any to that one prior sale. By the way, 10 months before or eight months before the homicide is his sale. This is so attenuated. It's an accumulation of really insufficient inferences in themselves to get to a place that this court has never gone. If you look at the cases, Brock and Gibbs and Hawkins, even cases where conspiracies are affirmed, they are not this case. There is some course of dealing that exists that creates that. With respect to the homicide, that's just floating. That's just a hypothetical based on a theory that is not confirmed in the record in the slightest. I think that in that context, to say that the homicide then all of a sudden comes back and proves the marijuana conspiracy, you haven't even gotten to stage one, which is Campbell's connection to the marijuana conspiracy. I understand the argument. In terms of the homicide, if it's a personal grudge because of having a gun pulled on somebody and then they enlist a friend, the record is in equipoise. This looks a lot like an awful lot of cases that are prosecuted under the rubric of murder in aid of racketeering, where the racketeering motive overlaps with other possible motives and so on. Really, what we're talking about is a jurisdictional issue as to why this is in federal court rather than... That is a principle issue though, Your Honor. That's really what the issue is. It also depends on the ability to prove count one, which is Mr. Campbell's participation in the marijuana conspiracy. Yes, United States v. Thai, everybody's familiar with that. There really is no record on this, so I don't think that there is a basis for saying that there is a motive at all for Mr. Campbell, even assuming he participated in the homicide. In that context, I'm way over time, so I will stop unless the court has questions. I think we're okay. Thank you, Your Honor. Ms. Sternheim is up next for Mr. Peter. I see you have graciously given one minute to Mr. Yanella, so go ahead, Ms. Sternheim. Yes, I have. Good morning, Your Honors. I represent Sean Peter, the brother of Streets. Just to begin, Judge Lynch, when you were referring to the, quote, conspiracy bad, you said they had cleaned out Streets' apartment. It was not Streets' apartment that the defendants left from. It was Sean Peter's apartment. I just wanted to clarify that. Just to link that together, there was no evidence that anything in that bag had any correlation to Sean Peter's brother, Streets. Now, they are brothers, so there is a relationship between them, but there was no evidence of any agreement whatsoever that they ever sold together, that they ever sold for one another, that they had any stake in each other's ventures or any relationship. Ms. Sternheim, what about the evidence that Robinson would contact your client and then direct him to Streets to get the marijuana? Why isn't that some evidence of his involvement? Well, they were brothers. Mr. Robinson lived in the same building that Streets had his residence or his apartment. He was looking for Streets, who was his preferred and go-to dealer. He called his brother. He said, do you know where your brother is? Either Sean Peter did or did not know where his brother was. And there was a couple of marijuana from Peter, Sean Peter, the brother. But nothing more than willing buyer and willing seller. That's an argument. But why isn't that a set of facts from which a jury could draw conflicting inferences? It could be that they're just brothers and because Robinson knows them both, he'll buy from either one on different occasions. Or does it suggest that they're, that Robinson at least viewed them as interchangeable and as part of the same operation and that they acted that way? Well, Judge, I think that is somewhat of a stretch. And albeit because of their fraternal relationship, it may be an easy one to make. But if a store doesn't have a product and you say, go to another store, that doesn't mean that the stores are in cahoots with one another. Yeah, actually, I think the fact that they're brothers is the only thing that is helpful to you in this situation, right? Because that gives you an alternative theory. If some other guy had been driving around and said, if, and see... I'm sorry, Judge, you had frozen. I didn't hear you. Oh, okay. Do you hear me now? Yes, I do. Okay. If some other guy had been driving around the block, sees Martinez and says, if you're trying to rob my man's streets, you got another thing coming. That would be a better case, it seems to me, for the government. It's the fact that they're brothers that lets you make the argument that they're not in it together. They're just brothers. So they do what brothers do for each other. And they're not really part of the same gang, right? Yes, I agree with that. But in and of itself, knowing, as Martinez testified, that streets was an easy mark for people in the neighborhood to rob or in some way harm. The fact that a brother who sees people dressed in black, masked, armed, and with guns prowling the neighborhood and going to that home and then passing that home does not establish a drug conspiracy or a motive for a shooting that occurs later on to have been in relation to a drug conspiracy. Even the government conceded that there could have been a personal reason, the fact that Julian Martinez pointed a gun to Sean Peter's head and pulled the trigger two to three times to shoot him in the head. That is a very strong motive, perhaps, for retaliatory action, but certainly not motive for a murder in connection to a marijuana conspiracy. All right. Thank you very much, Ms. Sternheim and Mr. Ionella or Mr. Sider. We have reserved one minute for rebuttal. Good morning. I'm Donald Ionella and I represent the other guy. And when I say that, I'm not diminishing the seriousness of this proceeding. I'm referring to my client as the other guy because that's how he was referred to at the trial. The only evidence that the government possibly had here is what the government calls post-murder evidence related to marijuana. And that would be the bag that comes out of Sean Peter's home, not out of Streets' home, after the fatal shooting. But that alone does not prove that my client was involved in a marijuana conspiracy. First of all, the government hasn't proven the existence of a marijuana conspiracy between my client and Streets. There was no evidence that my client ever met Streets. There was no evidence that my client even knew that Streets lived on Olinville Avenue or sold marijuana there. There was no evidence that my client was aware that Brian Gray, the deceased, and Julian Martinez had attempted to rob Streets. And then Julian Martinez tried to shoot Sean Peter twice. There was no evidence that my client even knew about that. And that's why the district court said it was a very close case and reserved decision on the Rule 29 motion. They haven't proven the existence of the conspiracy, which is a linchpin for the entire case. They haven't proved that my client knowingly and intentionally joined the conspiracy, the marijuana conspiracy. I don't want to say conspiracy because we might blur that with any... if that were the charge here. So I want to always use the word marijuana conspiracy. And then finally, there was no proof of a nexus between the fatal shooting or the murder, whatever language you're going to use, and the marijuana conspiracy, at least not for my client. My client didn't have a prior marijuana sale. My client had never been present when anyone sold marijuana. My client wasn't even present when marijuana was in the air, let alone possessed for... I think the district court, although I understand what you're saying in terms of being a close call, relied primarily on the role, the active role that your client played in the murder to allow the jury to infer because of his role in the murder that not only, I guess, was he aware of the underlying reason for the murder, but that he was operating with the same intent as the other individuals involved to protect the drug operation. So you're just saying that the jury couldn't make the rational... the district court decided the fact that he was involved in staking out Gray in Plainton, New Jersey. They shared the cell phone with Campbell. Campbell and your client first identified Gray on the street and set the events in motion. So I think that's the bottom line. It's that she concluded those things together allowed there to be an inference that the client knew the purpose and was intended to assist in that way. Well, I'll deal with those individually. There's no evidence that my client, when he went up onto Barker Avenue, was intending to defend streets. There's no evidence that he knew streets. So the inference that you said the district court judge, and she did, she did draw that connection, but it's through Shawn Peter. She's basically inferring, and I don't think it's a... I think it's a specious argument. I don't believe there is a basis for such an inference. They're inferring that somehow with no evidence of it, they're inferring that Shawn Peter must have told my client, we're going up to shoot these individuals on Barker Avenue, and we're doing it to protect Streets' marijuana conspiracy. Suppose he thought it was to protect Shawn's marijuana business rather than Streets. After all, he is aware. Are you saying he's also, as Mr. Gretel argued, that he has no awareness of what's in the bag? That's a separate argument. I'll get to the bag in a moment. But there's no evidence that Shawn Peter sold drugs. There's no evidence that my client was ever present with Shawn Peter. Except for the bag, and you're putting that aside. What's the relationship of your client to the bag then? The bag seems to be evidence of men being taken out of one individual's house, Shawn Peter, not my client's house and not Streets' house. It's carried only by one person. The bag contains false identifications with pictures and the name of Shawn Peter, not Steven Sider. Is it Shawn who carries the bag? Yes, it's definitely Shawn Peter, and the government argued that Shawn Peter alone carries the bag out. It's on a video recording and places it in the van. So there's false identifications in Shawn Peter's bag. Are we now going to infer that my client was involved in a conspiracy to commit identity fraud? Just due to the contents of the bag, you can't assume that my client previously was involved in a marijuana conspiracy with Shawn Peter or Streets. It seems what they were trying to do is get away from a fatal shooting and being accused of possession of guns. I mean, that's the most likely inference to be drawn, and they're trying to get medical attention for Shawn Peter, who had just been shot. And maybe Shawn Peter didn't want to leave behind evidence of what was in his house in case the police somehow ended up there later in the night. Okay, those are all reasonable inferences, but there's no evidence to suggest that just because those things were in the bag that my client previously had been involved in a marijuana conspiracy. Now, I would submit that the government really went over the line in this case by waiting until the Rule 29 arguments for the first time to suggest that they had gone to Leicester Street, where Shawn Peter lived and where the bag came out of, prior to the guns. Prior to that, the government's narrative, which was first mentioned in Sider's bail hearing in early 2018, and then repeated in the motion for a bill of particulars in written opposition or an oral argument, their narrative had always been what was consistent with the 3500 material, that after the shooting, they went to Shawn Peter's house to stash the guns. I'm puzzled. They waited till the Rule 29 argument to make this argument, but of course, it would do them no good to make this argument if there were not evidence in the record supporting that the defendants had gone to that location before the shooting, right? Was there evidence or not evidence to that effect? There was not evidence except that the government then made this tortured argument, which is the subject of point two of my brief, which is the prosecutorial misconduct. They made this tortured argument, and I wanted oral argument in the district court. I would just beg the court to look at government exhibit 405B and see how the Jason Campbell is placing guns into the trash can after the shooting. They did this in open court in front of the jury. When the individual, Campbell, is not placing guns in the trash can, he was taking them out. He was taking them out. The government in Rule 29 forecasts that they had gone to Sean Peter's house prior to the shooting and retrieved guns. Now, that video of them going to Sean Peter's house, it all lines up to be after the shooting, and that's what the 3500 material of Detective Green seemed to indicate. He said in his 3500 material that they went after the shooting and they stashed the guns. During Rule 29, they forecast that they were going to say that they retrieved the guns beforehand, and then it was this big sleight of hand where they had this turret light argument, which we didn't even understand at the time. I'm going to bleed into another topic, which I will ask you to allow me to get to just briefly. They argued that there was a three-minute time period. They're running away from the shooting at six minutes after the hour. At eight minutes after the hour, they arrive down south at Lester Street, where Sean Peter lives. They go to the trash can. They put guns in the trash can. At eight minutes after the hour, they walk away from those trash cans and they go down south, away from the murder. The murder had happened up north. We learned for the first time during Rule 29, sort of, and then clearly in the closing arguments, the government was arguing that during that three-minute period, when they first came back to the house, that when they went south, away from the murder, and they go around the block, they just go around the block and they come back in less than three minutes afterward from the other direction, that during that three-minute time span, they had somehow gone south, somehow circled back up north, committed the murder, and then come back down from the opposite direction and placed guns in the trash can. The prosecutor on summation narrated that, and my jaw just dropped. You're six minutes over. You said you wanted to make one more point. I don't want to deprive you of that, but why don't you move to that last point? I'll give you one minute on the last point. Go ahead. Yeah, the turret light argument was that during the testimony of Detective Green, he said that certain videos at Lester Street were summations. That became, for the first time, 10 hours and 57 minutes. Again, that three-minute interval being when the government tried to shift the time frame. If we had known the government was going to go in that direction, we would have crossed Detective Green on whether he checked the time frames. In getting directly to the point, during summations, the government matched up one passing Lester Street, which is the furthest south camera, and the turret lights of the police car passing Lester Street. Then they said that one light passing Lester Street had to have been the same light that passed other addresses on Baxter Avenue three minutes later. That's how they changed the time frame of the Lester Street cameras by three minutes. But they played an exhibit that was 12 seconds long showing one set of turret lights going past that. We didn't know they were going to make this argument. After the trial, when you look at it, and I have this in my appendix, if you look at the full three minutes, three police cars passed those two other addresses on Barker Avenue. So there was no proof that one passing Lester Street didn't match up to the one that they said was on Baxter. It could have been any one of the three. All right. Thank you. I think we understand the argument. All right. Government, you have one minute for rebuttal. Mr. Ravi, you're up. May it please the court. My name is Sagar Ravi. I'm an assistant United States attorney in the Southern District of New York. I represent the government on appeal, and I represented the government in the proceedings below. The detailed and well-reasoned 45-page decision, Judge Buchwald properly denied the defendant's motions for judgment of acquittal on the basis of insufficient evidence and their motions for a new trial. Now, I'll turn first to the motion for judgment of acquittal. Judge Lynch correctly laid out the elements here. And with respect to the first evidence, was there a any reasonable dispute that there was evidence in the record that Streets had a marijuana operation and that that marijuana operation was operated in, among other locations, the stash house on Olinville Avenue? That was the same stash house that Brian Gray attempted to rob and which Sean Peter, Streets' brother, confronted in the middle of the night when he, when Brian Gray and Julian I've been confused throughout about that address. I take it this is a building with multiple apartments? It is a building, Your Honor, with the evidence of the record is that there were, there's a ground floor and a top floor. The top floor is where the witness, Laurice Robinson, lived. And the bottom floor, Mr. Robinson testified, was frankly an empty apartment. It was a stash house. It was where Streets operated his marijuana operation. He also operated in other areas, but that was the same place that Brian Gray robbed and that Sean Peter protected on that night. So that apartment, the ground floor apartment is what you're referring to as the stash house. And there is evidence connecting that to Streets. Yes, correct. And the location from which the bag of marijuana and other evidence was taken is a completely different location than that? It is a location that's about a block south of that. And that is Sean Peter's residence. And that's Sean Peter's residence. So no one came back to the stash house on the night of the murder. That is correct. Okay. And so going back to that stash house, there's also evidence that establishes that Sean Peter was a marijuana dealer. Laurice Robinson testified that he sold drugs himself. He also steered Mr. Robinson to Streets in order to purchase marijuana. And that both the Peter brothers sold marijuana out of also a separate corner weed store. It was a known weed spot in the neighborhood. And that is an area where three defendants, there's evidence in the record of that, that these defendants are all hanging out at a known weed spot. So, and Stephen Sider, in particular, is hanging out with known drug dealers. Again, that Streets, Sean Peter and Jason Campbell. Jason Campbell was also selling marijuana down the street from the same stash house. As far as Mr. Sider is concerned, your argument is that the fact that Sider hung out at this, as you put it, at this place where Streets is selling and it's a weed spot and so on. That of course doesn't suggest that Sider was participating in the marijuana sales at that time. But you're saying that it supports an inference that Sider knew what the Peter brothers did. And that's the evidence on which you rely to say that a reasonable jury could conclude that Sider knew what was afoot. Not just that he was going to murder someone for no particular reason or because somebody paid him to do so, but because the motive for this had to do with the drug business that Sean Peter was implicated in. Is that the chain of inferences? Yes, correct. And that's important because this, we didn't first see Stephen Sider on the scene on the day of the murder. He's not someone just in some of the independent gunman cases that just came in on that day. He has a pre-existing relationship with these other defendants and Streets that have a nexus to marijuana. What is the proof? I want a little more detail on that. What's the proof this previous, you said he hung out with them, but what was the actual testimony? What does that mean? The testimony is that the Peter brothers sold weed out of a local weed spot, which is a corner store. And that Mr. Robinson had seen the Peter brothers, Jason Campbell and Stephen Sider hanging out regularly at that weed spot. It is just that, that they were all hanging out at that weed spot. But not on one occasion, you used the word regularly, the testimony was regularly? Uh, yes, that they hung out at that, at that spot regularly, uh, is, is my recollection of Mr. Robinson's testimony. Uh, now, but, but again, uh, Mr. Sider's role in particular needs to be viewed in that context, but then we get to the later events, right? We have, uh, the, the day that Brian Gray attempted to rob the stash house. Again, that's a stash house that Jason Campbell is connected to, Sean Peter's connected to, Streets is connected to. Uh, and Peter, and just to correct the record, uh, you know, defense counsel, uh, Judge Bianco, I think you indicated that, um, you know, Sean Peter didn't just confront Martinez about Rob, you know, you're not, are you going to rob my brother? You got another thing coming. He also confronted Gray. So he first went and confronted Gray in the middle of the night. Uh, and then he circled the block and came around again and circled Mr. and confronted Mr. Martinez. So just that evidence by itself indicates, uh, that Sean Peter, uh, you know, was protecting that stash house. Again, this can't be a random coincidence that he sells weed with his brother, Sean, and then is then protecting the stash house. Then we get to two weeks later, there is an orchestrated, coordinated, planned murder hit on Brian Gray involving these three defendants and getting to the point about Stephen Sider. Uh, Judge Buchwald, uh, through her lengthy decision correctly found that, uh, Stephen Sider clearly wasn't just a passive participant. He wasn't just, he wasn't Mr. Robinson that just came in on the van, uh, after the murder had taken place. Stephen Sider and they spotted Gray and his friends hanging out at a local bodega. They then go meet up with Sean Peter. They then follow the victims, uh, and surveil them. It can't be that if you are a shooter, you have an active role in a murder that then it could be automatically inferred that you are aware of the underlying purposes of the murder and trying to protect a drug operation. It can't be that just the role alone would be enough, right? There's no cases of that. I agree. The role alone is not enough, but when you, uh, couple that with the evidence of his preexisting relationship, uh, with these defendants and streets and their nexus to marijuana, as well as the evidence after the murder. And I'm going to get to that about the getaway bag, which I think the jury reasonably found in Judge Buchwald found was in their joint possession. Uh, that all can to a clear inference. Uh, and the conclusion that Mr Sider knew exactly what was happening here. Um, and, and again, it, it also kind of just goes to common sense here. We have, uh, you know, defense have argued vigorously in front of the jury that this was, uh, you know, personal issue, a personal dispute that these three defendants were doing this murder for. But that does not explain the active roles that Stephen Sider and Mr. Campbell had in that they would commit a murder to simply help a friend confront Brian Gray, who didn't even try to shoot him. It doesn't make sense. And again, going to the active role in the murder, Stephen Sider, uh, is the one who first spotted them. Then after they retrieved their guns in unison, they went back to where the victims were located. And according to eyewitness Ronald Bettis, it was actually Stephen Sider. That was the first shooter. He's the one who initiated the attack on Gray and the other three victims. And, uh, and then of course they all came back and stashed their firearms and all entered Sean Peter's apartment in unison. And again, it wouldn't make sense that Stephen Sider would be leading this attack, uh, you know, if he didn't have some sort of stake in the outcome. And I, you know, this court has held in the Santos case aside in our briefs that, uh, the jury, once you establish knowledge of a conspiracy and you can prove that someone took acts in furtherance of that conspiracy, that you can infer intent and agreement to that conspiracy. And that's what we have here. Now, uh, the post, uh, post murder evidence is also significant. Um, the three defendants go into Sean Peter's apartment. They, uh, stay there for approximately nine, 90 minutes. Uh, and again, this is all within a couple blocks of the stash house and the weed store. We're talking only a couple block radius of all of these events happening. Um, and they, they walked out in unison with that getaway bag and enter, uh, the vehicle driven by the Reese Robinson. Now it's, it's important here to note that that, that bag, Peter is carrying the bag into the van, but it's not just kept with Peter. Uh, the bag is placed wide open in the middle of the back seat in which Peter and Sider are sitting. Uh, it, when you look at the bag, when it was found, it was wide open. You could see marijuana. You could smell the marijuana emanating from the bag. So of course, everyone in that vehicle knew exactly what was in that bag, but separately after they get to the hospital, Stephen Sider, uh, and, uh, Sean Peter go to the hospital and, uh, the bag is left in the custody of Jason Campbell. Uh, and, and that's important because not only does it show that, you know, he has a evidence, uh, but that bag is very important. Why is it important? It contains evidence of all of their crimes. It contains a pound of marijuana, which is clearly a distribution quantity. It contains marijuana tools of distribution, which includes actually small hundreds of plastic baggies and actually baggies pre pre-packaged with marijuana that was ready to sell. It contained $3,000 in drug proceeds. And importantly, it also contained evidence linking them to the murder and not just one of them. It contained evidence linking all of them to the murder. Uh, there was ammunition, three different kinds of ammunition and spent shell casings in that bag, which matched the type of ammunition that was found at the scene of the murder, as well as the bodies recover from the bodies of gray, uh, and Steven cider, uh, sorry, one of the other victims. And, uh, it also contained a cell phone and one of the victims, uh, and it also contained an ID, uh, in a fake name, which was the same ID and an ID in the same name was also found on Steven cider's person. So again, this is a bag that's clearly, uh, involved in these defendants in evidence of their crimes and trying to get away with it and going to the hospital, uh, where afterwards they're arrested for that bag. And of course they then tell you in unison coordinated fake cover stories about what happened that day. This all just goes to show that these three defendants, uh, were coordinated and all had an interest in what was going to happen here. Uh, and judge Buckwell found and the jury found, uh, from all of that evidence that they were guilty on all counts, uh, because of that. Mr. Rabbi, can I just ask you, you have like two minutes left. I want you to respond to Mr. Yanella's, this government exhibit 405B and pulling the guns out versus putting them in the garbage. Can you just address that? Sure. Uh, so, uh, your honors, um, when we introduced the video at trial, that was through the, the videos in detail with detective green. And, uh, actually initially we asked him to describe what he saw in the videos. Uh, and that was objected to by the defense. They indicated to the judge that we don't need a witness to describe what's in the videos. No, the jury can decide it's any lay person can decide what they see in the videos. Uh, and so we didn't have detective green testify as to what he viewed in the videos. We simply showed the videos and, uh, your honors can look at the videos themselves. Uh, but they, they, they show and what we believe the jury found and we proved at trial was that the defendants are clearly, uh, getting firearms, uh, from the trash cans to begin with. They go to the seat of the murder, uh, and then they return and they stash the firearms. And, uh, you know, the jury can certainly see that from the videos and we laid out at trial detailed framework with how the timing of those videos worked and why they were in that order. But importantly, as judge Buchwald found the order of events that occurred that night only makes sense, uh, with the narrative that the government, uh, uh, provided to the jury. Uh, Mr. Young's point about them coming after the murder and, and then, uh, you know, stashing firearms and then retrieving them later simply doesn't make any sense, uh, given the overwhelming evidence that it was these three defendants who committed that murder. So there are two, there are two different videos of these men at the garbage cans. There are, uh, there are videos, it's exhibits 404 and 405, uh, are the, the is the kind of overall clip of videos. And those do show, uh, there's a set there's in time order, they first come to the trash cans and then approximately three to four minutes later, they come back to the trash cans. Uh, and from that evidence, the jury can certainly, uh, see the video. But there's no, there's no question. These are two different episodes of interaction with the trash cans, not two different angles of view. That's correct. Okay. So, and your argument to the jury was that, and are guns visible in these videos? Uh, we, we played us one, one screenshot of a video where you can see a kind of a black L shaped object. Uh, but there, it is blurry video. Yeah. And the argument, uh, the argument about what, whether that or some other object is being put in or taken out, uh, if it is a gun, it would not make a lot of sense that it was being put in the trash can before the murder and then retrieved from the trash can after the murder. I agree, your honor. And, and I, I frankly don't quite understand exactly what, um, if you do change the order, I'm not exactly sure what that gets, gives the defense, but, uh, uh, but I, you know, the, the clear matter is that we, all the videos were in evidence. Uh, we, we made the arguments we made about what the video showed. The defense clearly made the same arguments that they made to your honors about what happened in the videos. And the jury came back with its verdict. All right. Thank you, Mr. Ravi. Mr. Inouye, you have one minute in rebuttal. Your honor. Uh, I want to answer more directly the question about the evidence about the Peter brothers allegedly selling drugs at this corner store. As the government just argued, all that evidence comes from the testimony of one witness. And I would urge you to look at that testimony. His name is Laurice Robinson. And he never said the Peter brothers sold drugs together at any corner store. He never said that Steven Sider or the other defendants were there with streets. And he never said they did so regularly. The government used all three of those phrases and they're not supported by the evidence. The government used it in their closing argument in rule 29. And now they used it in the appeal brief. And now in the argument, look at Laurice's Robinson and you'll see how the government manipulated the evidence in this case. Um, I would also argue that you know, it manipulated what they, what they did was made arguments. And if those arguments were inaccurate, uh, if, if, uh, Robinson didn't say regularly, presumably that was pointed out to the jury, right? It was, it was, uh, we, we, we, pointed out, uh, it's, it's a very tough situation for, uh, to make an argument that even though there appears to be evidence of a murder, there's no jurisdiction here, uh, uh, because there's no nexus to a marijuana conspiracy. And I think the jury was just inclined to convict because they had evidence of what appeared to be a murder. It's more of a legal argument and it's more appropriate. I'm just letting your honors know how they greased the skids in front of the jury, uh, by doing, by, by what they, how they mischaracterized Mr. Robinson's testimony and how they changed the video at six minutes after the hour, suddenly during rule 29 argument and closing argument, that was no longer six minutes after the hour. It was now like nine minutes after the hour because of this convoluted turret light argument. I still don't understand why it makes a difference if they, uh, are standing around. It's one thing if I understand the argument, this garbage can stuff has nothing to do with guns or something like that. And they're totally wrong about this, but if they're at, if it is guns and they're at the garbage cans before, and then they're at the garbage cans at some other point doing something else, how, how does it make any sense? They didn't throw away the guns and then shoot somebody and then go back and pick up guns. No, that's a great question, your honor. What the, what the difference is about which one came first. It's not really important in terms of the shooting, where it became important. And with the unspoke, the elephant in the room is the government argued to the jury that they all had to have been, uh, they all had to have collectively possessed what they called a drug dealer goodie bag that came out of Sean Peter's house because they were a unified triumvirate in this every step of the way. Well, but the goodie bag had, uh, ammunition from three different guns that matched three different guns that were used in the, uh, in, in the murder, right? That's proof of the murder. It also had marijuana. I understand that, but the stuff that got into the bag is linked to all three of them. At least something that got is in the bag is linked to three different people. If it's three different guns. But it doesn't make them part of Streets' marijuana conspiracy. It doesn't make the shooting of Brian Gray. And this was all the way for the government to argue that, and they use the words, it's absurd. It's ridiculous to think that, uh, they didn't all know what was in the bag and collectively possess everything in the bag. And I'm not pointing out the firearms. That's the murder. I'm talking about the marijuana. They're trying to tie. They're trying to use the marijuana in the bag to prove the existence of a conspiracy, a marijuana conspiracy to prove siters, knowing participation in that conspiracy and to prove the nexus. So they strengthened that argument by, by arguing to the jury that he, that he had been to that location prior to the shooting as if he controlled that location. All right. All right. Thank you, Mr. Yanawa. Thank you to all of you for the argument and we'll reserve decision. Have a good day.